# IN THE COURT OF APPEALS OF IOWA

No. 22-0063
Filed February 8, 2023

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**MATTHEW PAUL FORD,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Muscatine County, Jeffrey D. Bert,

Judge.


        Matthew Ford appeals his convictions for two counts of second-degree

sexual abuse.  **AFFIRMED.**


        John O. Moeller, Davenport, for appellant.

        Brenna Bird, Attorney General, and Louis S. Sloven, Assistant Attorney

General, for appellee.


        Heard by Vaitheswaran, P.J., and Schumacher and Ahlers, JJ.

**AHLERS, Judge.**

When must a *Batson* challenge claiming that a prosecutor is using peremptory challenges in an impermissibly discriminatory manner be raised? The answer to that question resolves this appeal.

Following a jury trial, Matthew Ford was convicted of two counts of second-degree sexual abuse—each a class "B" felony in violation of Iowa Code section 709.3(1)(b) (2019). Ford appeals and raises one issue. He contends the State used its peremptory challenges in an impermissibly discriminatory manner to strike prospective male jurors, resulting in a jury of eleven women and one man.

We start with a review of the terminology related to jury selection. Identifying the terminology can be challenging due to differences and inconsistencies in how the same groups are defined by statute, referred to in case law, and referred to in common parlance. The supreme court has identified many of the various groups related to jury selection and likened the groups to concentric circles. *See State v. Plain*, 969 N.W.2d 293, 294–95 (Iowa 2022). Borrowing from—and expanding upon—the supreme court's theme in *Plain*, we get the following terminology: from the community we draw the master jury list members[1]; from the master jury list members we draw the pool[2]; from the pool we draw the

---

[1] *See* Iowa Code § 607A.3(8) (defining "master jury list" as "the list of names taken from source lists for potential jury service").

[2] *See* Iowa Code § 607A.3(6) (defining "jury pool" as "the sum total of prospective jurors reporting for service"); *see also State v. Plain*, 969 N.W.2d 293, 294–95 (Iowa 2022). In Iowa, the statutory term "pool" is sometimes referred to as the "venire." *See Plain*, 898 N.W.2d at 821 n.5 ("Under Iowa's jury-selection statutes, a jury 'pool' (i.e., venire) consists of all persons who are summoned for jury service and who report."). We address possible confusion over use of the term "venire" in the next footnote.

panel[3]; from the panel we draw the potential jurors[4]; and from the potential jurors, peremptory strikes are exercised and we are left with the jury or jurors.

Having reviewed the terminology, we turn to the issue before us. Ford's challenge is rooted in the Equal Protection Clause of the Fourteenth Amendment. In 1986, the United States Supreme Court declared that the Equal Protection Clause forbids a prosecutor from using peremptory challenges to strike potential jurors on account of their race. *Batson v. Kentucky*, 476 U.S. 79, 89 (1986). Eight years later, the Supreme Court extended this principle to conclude that the Equal Protection Clause also forbids a state actor from using peremptory challenges to strike potential jurors on account of their gender. *J.E.B.*, 511 U.S. at 130. To challenge the State's exercise of a peremptory challenge, the party alleging gender discrimination must make a prima facie showing of intentional discrimination. *Id.*

---

[3] *See* Iowa Code § 607A.3(10) (defining "panel" as "those jurors drawn or assigned for service to a courtroom, judge, or trial"); *Plain*, 969 N.W.2d at 294–95 ("The jury *panel* refers to members of the pool directed to a particular courtroom after they arrive at the courthouse to serve as possible jurors for a specific trial."). This is an area of confusion in terminology, as what the Iowa Code defines as a "panel" is sometimes referred to by judges, lawyers, and appellate courts as the "venire." Especially in the federal system, even though the word "venire" does not appear in the Federal Rules of Criminal Procedure, it appears that "panel" and "venire" are sometimes used interchangeably. *See*, *e.g.*, *Nolan v. United States*, 423 F.2d 1031, 1035 (10th Cir. 1969) ("It is settled beyond doubt that the constitutional fair- and impartial-jury guaranty does not require that every economic, racial, or ethnic class shall be represented on every jury venire or panel."). We mention this difference because, in citing federal cases later in this opinion, frequent reference is made to "venire," which we believe would be the "panel" in our state's terminology. Exemplifying the confusion is the definition of "venire" in Black's Law Dictionary. Black's defines venire as "[a] panel of persons selected for jury duty and from among whom the jurors are to be chosen," and then goes on to note that the venire is also termed "array; jury panel; jury pool; (redundantly) venire panel." *Venire*, *Black's Law Dictionary* (11th ed. 2019).
[4] *See J.E.B. v. Alabama ex rel T.B.*, 511 U.S. 127, 143–44 (1994) (referring to the group from which peremptory challenges are exercised as "potential jurors").

at 144–45. If that showing is made, the State must provide a gender-neutral basis for exercising the peremptory challenge. *Id.* at 145.

Ford bases his challenge on the fact that the State used five of its seven peremptory challenges to strike men from the panel. Ford asserts this was impermissible gender discrimination, he made a proper allegation of gender discrimination to the district court, he made a prima facie showing of intentional discrimination, and the State failed to provide a gender-neutral reason for exercising its peremptory challenges to strike five men. The State resists Ford's claims on the merits, but it also argues Ford did not make a timely *J.E.B.* challenge to preserve error.

We begin by addressing the State's error-preservation claim, as we find it dispositive. The record shows that, after the selected panel members were passed for cause, the parties began exercising their peremptory challenges toward the end of the first day of trial. During that process, Ford raised a race-based *Batson* objection to the State's use of a peremptory challenge to strike a Hispanic male from the panel. The objection was overruled, resulting in the peremptory challenge being given effect and that man not sitting on the jury. Ford raises no issue about the ruling on this objection on appeal.

After both sides exercised their peremptory challenges, the district court discharged all remaining panel members and adjourned court for the day, leaving only the members of the jury subject to continued service and the obligation to return the next day.[5] The next morning, Ford lodged *J.E.B.* objections, claiming

---

[5] The record is not crystal clear on when the panel members who did not become jurors were dismissed. The best indication we have from the record comes from

the State had engaged in gender discrimination by using five of its seven peremptory challenges to strike males from the panel. The court overruled the objections, and the trial was held, resulting in the guilty verdicts and sentencing from which Ford appeals.

The State contends that, by waiting until the remaining panel members had been discharged before lodging his *J.E.B.* objection, Ford's objection was too late to preserve error. Ford claims his objection was timely.

While the parties point to no Iowa appellate cases directly on point—and we have found none on our own—we do have guidance from our case law as well as case law from other jurisdictions. In *State v. Johnson*, our supreme court addressed the timeliness of a defendant's post-trial challenge to the entire jury panel, finding it to be too late to preserve error. 476 N.W.2d 330, 334 (Iowa 1991). In doing so, the supreme court noted "that our conclusion accords with cases from other jurisdictions holding that a defendant's failure to timely object to a

_____

statements made by the court during the hearing on Ford's motion for new trial. During that hearing, held in conjunction with sentencing, the court noted that it had dismissed the panel members who did not become jurors the night before Ford made his *J.E.B.* objection. Ford expressed no disagreement with the court's statement and, on appeal, does not point to anything in the record contradicting the court's statements. As a result, we conclude the panel members who did not become jurors were dismissed before Ford's *J.E.B.* objection was made.

We note that a similar method of piecing together portions of the record to determine when panel members who did not become jurors were excused was used in *United State v. Clark*. 409 F.3d 1039, 1043 (8th Cir. 2005) (noting the district court's statement that it "didn't hear about the [gender-based *Batson* challenge] issue until [it] had already let the other jurors go"). To avoid the need to piece together portions of the record to make determinations such as this, we encourage attorneys and district courts to make a record of when dismissal of panel members who did not become jurors occurred. If a contemporaneous record is not made, then we encourage the parties to use Iowa Rule of Appellate Procedure 6.806 to complete the record.

prosecutor's alleged discriminatory use of peremptory challenges waives consideration of the issue on appeal." *Id.* This suggests that we require a timely objection, but it begs the question of where the timeliness line is drawn. To answer that question, we turn to other jurisdictions for insight.

In looking to other jurisdictions, we note that *J.E.B.*'s prohibition on gender discrimination in exercising peremptory challenges is based on the same logic that prohibits race discrimination in the exercise of such challenges. 511 U.S. at 146. Therefore, we find cases addressing race-based objections to the exercise of peremptory challenges as instructive on the gender-based objections here.

The consensus from other jurisdictions is that *Batson* or *J.E.B.* objections raised after the panel members have been discharged does not preserve error. The reasoning expressed in those cases follows a similar theme. That theme is that waiting until the panel members have been discharged to lodge the objection prevents the trial court from granting the relief called for if the objection is sustained—the reseating of the selected panel member sought to be struck for an improper, discriminatory reason.

In *Owens-Corning Fiberglas Corporation v. Henkel*, the District of Columbia Court of Appeals noted that, if an objection is not lodged until after the panel members have been released, "the court is effectively precluded from re-seating any individual who has been peremptorily challenged on the basis of race or sex." 689 A.2d 1224, 1228 (D.C. Cir. 1997). The court pointed out additional practical considerations requiring an objection before release of the panel members:

> Where, as in this case, a party claiming a *Batson* violation is silent during voir dire and complains only after the venire has been dismissed and the jury has been sworn, it becomes difficult (if not

> impossible) for the court and counsel to recreate in their minds the circumstances of each strike. It is not easy for an attorney charged with a *Batson* violation to defend a peremptory challenge if he or she can no longer remember the person challenged or the individuals seated in the jury box at the time. Delay likewise impairs the judge's ability to make an informed assessment of counsel's reasons for his or her strikes. A prompt objection is therefore essential if a *Batson* issue is to be addressed in an effective and meaningful manner.

*Id.* (footnote omitted). The United States Supreme Court has touched on the topic, recognizing as "sensible" a rule that deems a *Batson* objection to be untimely if "raised for the first time on appeal, or after the jury is sworn, or before its members are selected." *Ford v. Georgia*, 498 U.S. 411, 422–23 (1991). Federal courts in multiple circuits have reached similar conclusions and added clarity to the timing issue. *See, e.g., Clark*, 409 F.3d at 1043 (holding that a gender-based *Batson* challenge is untimely "if it is not 'made at the latest before the venire is dismissed and before the trial commences'" (quoting *United State v. Parham*, 16 F.3d 844, 847 (8th Cir. 1994))); *Morning v. Zapata Protein (USA), Inc.*, 128 F.3d 213, 216 (4th Cir. 1997) (concluding that the circuit courts have required *Batson* challenges to be raised, at the latest, before the venire is excused and concluding "[i]n light of these precedents, it is a modest and well-justified step to hold that a *Batson* challenge raised after the venire has been excused has been raised too late"); *Parham*, 16 F.3d at 847 ("We now agree with those circuits that have held that a *Batson* objection must be made at the latest before the venire is dismissed and before the trial commences."); *United States v. Maseratti*, 1 F.3d 330, 335–36 (5th Cir. 1993) ("[T]he *Batson* objection must be made before the venire is dismissed and before the trial commences." (quoting *United States v. Romero-Reyna*, 867 F.2d 834, 837 (5th Cir. 1989), *cert. denied*, 494 U.S. 1084 (1990))); *United States*

*v. Reid*, 764 F.3d 528, 533 (6th Cir. 2014) ("We now hold that a *Batson* challenge must be raised contemporaneously with the voir dire process or prior to the time that the venire is dismissed.").

State courts addressing the issue have reached similar results. For example, the Virginia Supreme Court has applied its statute requiring *Batson* objections to the seating of jurors to be asserted prior to the jury being sworn. *Bethea v. Commonwealth*, 831 S.E.2d 670, 677 (Va. 2019). It analogized to federal court rules requiring contemporaneous objections, highlighting the practical benefits of such rules:

> Given the often subtle reasons for the exercise of peremptory challenges, a court's determination of whether a prosecutor has used them in a discriminatory fashion will often turn on the judge's observations of prospective jurors and the attorneys during voir dire and an assessment of their credibility. *It is nearly impossible for the judge to rule on such objections intelligently unless the challenged juror either is still before the court or was very recently observed*.

*Id.* (quoting *Weeks v. New York*, 273 F.3d 76, 90 (2d Cir. 2001)). The Virginia Supreme Court also favorably cited the reasoning of its court of appeals on the topic:

> "The trial court is uniquely positioned to evaluate the circumstances in each case and to exercise its discretion" in deciding whether to reseat persons improperly struck from the jury panel or to discharge the venire and select a jury from a new panel. A trial court's exercise of discretion may be improperly cabined, however, if the challenge is made after the jury is sworn and the remaining venirepersons are discharged. At that point, the court cannot reseat a juror improperly stricken, and discharging the venire and beginning the process of jury selection anew may be compelled under the circumstances. Such a result will generally serve neither the public policy *Batson* seeks to advance, nor the fair administration of justice.

*Id.* (quoting *Lewis v. Commonwealth*, 492 S.E.2d 492 (Va. Ct. App. 1997)).

Other state courts have weighed in as well. The Missouri Court of Appeals has reasoned:

> There simply is no justification for defense counsel to wait until the remaining venirepersons are discharged to challenge the state's peremptory strikes. If defense counsel does wait until the venire panel is discharged and the challenge is sustained, then the jury selection process must start anew, and an additional venire panel must be called. This simply delays justice, and, in those jurisdictions where an additional venire is not readily available, the delay can be substantial.

*State v. Cummings*, 838 S.W.2d 4, 6 (Mo. Ct. App. 1992) (quoting *State v. Smith*, 791 S.W.2d 744, 747–48 (Mo. Ct. App. 1990)). Before reaching the conclusion that a *Batson* objection must be raised before the panel members are dismissed and the jury is sworn, the Kansas Court of Appeals collected federal and state cases coming to the same conclusion. *State v. Jackson*, 494 P.3d. 225, 233 (Kan. Ct. App. 2021). The Kansas court concluded:

> [The rule requiring a *Batson* challenge before venire members are dismissed and the jury sworn] makes practical sense and aims to safeguard the rights *Batson* was designed to protect. A timely objection allows a court to remedy a *Batson* violation without unduly burdening the parties, the court, and the prospective jurors. If a meritorious *Batson* challenge is raised during jury selection, an improper peremptory strike may simply be disallowed. But the only remedy for a meritorious objection after dismissal of the venire members and administering the jury oath is to declare a mistrial . . . and to begin proceedings anew. Starting over with a new jury panel imposes significant burdens on the court, the litigants, and the witnesses.

*Id.*

Finally, we note that a well-known treatise on criminal procedure has also collected cases on the topic and reached the conclusion that "[t]he challenger must raise the objection before the venire is dismissed and the jury is sworn." *See* 6 Wayne R. LaFave et al., *Criminal Procedure* § 22.3(d) (4th ed. Nov. 2022 update).

Before reaching our conclusion, we must tease out one additional nuance. As shown by the above authorities, the concepts of dismissing the other panel members and the swearing of the jury are often used in conjunction or interchangeably. While those two events may happen nearly simultaneously—and often do—they are not required to be done at the same time. This case involves a scenario where the two events were separated in time. After the other panel members were dismissed, Ford made his *J.E.B.* objections. After the district court overruled the objections, the jury was sworn. This sequence of events requires us to decide where the error-preservation line is drawn. Is it drawn when the other panel members are released, or is it drawn when the jury is sworn?

We find the appropriate place to draw the error-preservation line is after the remaining panel members (including the peremptorily challenged panel members) have been dismissed. Based on the reasoning from the above authorities, the event that casts the die is the dismissal of the remaining panel members, not the swearing of the jury. Once the remaining panel members are dismissed, they are discharged from their obligations and relieved of the restrictions of the admonition. As a practical matter, the district court effectively loses its control over those panel members when they are told they can leave. At that point, even if a *J.E.B.* objection is made and granted, the remedy (i.e., allowing the selected panel member sought to be peremptorily challenged to remain as a selected panel member) is no longer available, as that person is gone and is not required to return for this trial.

We find the above authority persuasive, both by the volume of cases reaching similar conclusions and the reasoning behind those conclusions. By waiting until the panel members were dismissed before raising his objection that

the State used its peremptory challenges in a gender-biased, discriminatory fashion, Ford waived the objection. As the issue is not preserved for our review, we affirm without reaching the merits of Ford's *J.E.B.* objections.

**AFFIRMED.**