PRESENT:  All the Justices

JAMES WILLIE BETHEA

v.  Record No. 180527

COMMONWEALTH OF VIRGINIA

OPINION BY
JUSTICE D. ARTHUR KELSEY
AUGUST 28, 2019

FROM THE COURT OF APPEALS OF VIRGINIA

A jury convicted James Willie Bethea of first-degree murder.  On appeal, Bethea challenges that conviction by claiming that the trial court violated the holding of *Batson v. Kentucky*, 476 U.S. 79 (1986), by permitting the prosecutor to exercise a racially motivated peremptory strike of an African-American juror.  The trial court found that the strike was not racially motivated, and the Court of Appeals affirmed, as do we.

I.

A grand jury indicted Bethea for the first-degree murder of Charles Adkins.  Bethea's first trial ended in a mistrial because the jury could not reach a verdict.  During the jury selection for Bethea's retrial, the trial court, the Commonwealth, and the defense asked a series of voir dire questions of the jury panel.

Throughout the questioning by the Commonwealth, the transcript recorded several different types of responses from the 23-member venire panel.  The transcript sometimes recorded what appears to be the panel's collective verbal answers, particularly to the prosecutor's general questions that suggested a yes-or-no right answer.  *See* J.A. at 12-13, 16-17, 27-29, 31-32 ("THE JURY PANEL:  Yes."); *id.* at 16-17, 20-21, 27-28, 30, 32, 34 ("THE JURY PANEL: No.").  The transcript is unclear, however, whether the court reporter was verifying that she personally had heard an audible "Yes" or "No" from each of the 23 venire members or, perhaps just as likely, that she was simply noting her interpretation of an amalgam of their verbal and non-verbal responses to questions that suggested a particular answer.

The prosecutor indicated once that jurors had raised their hands to communicate an affirmative answer to a question. *See id.* at 13 ("Has anyone here served on a jury before? A couple of hands. Keep them up for me for a second."). In several other places, the transcript recorded a non-answer to questions by the prosecutor: "THE JURY PANEL: No response." *Id.* at 16, 18, 19, 20, 33. And, on several other occasions, no response at all is again recorded for a pending question, but the prosecutor, apparently prompted by a nod or a raised hand, specifically identified a juror who had offered a personal response to the question. *See id.* at 17, 18, 22, 32-33. At one point during voir dire, the trial court called upon a specific juror by name and asked, "you heard the questions that I asked earlier. I didn't hear you raise your hand or see you raise your hand. Do you have any issues at all that you need to bring forward to the Court?" *Id.* at 26-27. The transcript thereafter stated, "(No audible response.)." *Id.* at 27.

After voir dire, both sides exercised their peremptory strikes. *See generally* 5 Ronald J. Bacigal, Virginia Practice Series: Criminal Procedure § 16:6, at 479 (2018-2019 ed.) ("In felony cases, the Commonwealth and the defendant have four peremptory challenges each . . . ."). The Commonwealth used two of its four peremptory strikes on African-American jurors. Bethea's trial counsel made a *Batson* challenge to the Commonwealth's exclusion of both African-American jurors. He stated that he had become "aware of a conversation" between his law partner, "Mr. Leahy," and the prosecutor that had occurred after the first trial. *Id.* at 37. In this conversation, the prosecutor reportedly relayed to Leahy that "the jury was nine-to-three to convict, and the three people who voted to acquit were black and then something about the Black Lives movement." *Id.*[1]

---

[1] On appeal to this Court, Bethea corrected the description of this conversation in the Court of Appeals opinion as between "former defense counsel" and the prosecutor, *see Bethea v.*

2

In response, the prosecutor said that, with respect to the stricken juror at issue in this appeal,[2] she had struck the juror because the juror "didn't answer all the questions and she appeared emotional at times." *Id.* at 38. "And when I asked if everyone would promise to consider all the evidence, and if they would raise their hand to do so," the prosecutor explained, "she didn't raise her hand." *Id.* Bethea's counsel replied: "I don't think that amounts to anything, Your Honor. I mean, I was watching her. I didn't see her getting particularly emotional during the voir dire. I was scanning the jury for people to raise their hands. I don't know what that amounts to." *Id.* Bethea's counsel did not, however, contend that the prosecutor was mistaken about the specific voir dire question that she had recalled asking or about the response that she had remembered the juror making to that question.

During the colloquy with counsel, the trial court stated that it did "recall when [the prosecutor] made the request, when the jury was to raise the hand." *Id.* at 40. But the court stated that it "did not scan the jury" and "did not see at that time that anybody did not raise their hand." *Id.* Based upon its own recollection and counsel's arguments, the court denied the *Batson* motion, holding that the prosecutor's explanations "are race-neutral reason[s] for making these particular peremptory strikes, and I'm going to allow them to go forward as stricken." *Id.* at 41. The court also observed that, even following the Commonwealth's use of two of its four

---

*Commonwealth*, 68 Va. App. 487, 494, 502 n.7 (2018). In his opening brief, Bethea clarified that the same defense counsel had represented him in both trials and that the prosecutor had made the comments to his counsel's law partner and not to his counsel directly. *See* Appellant's Br. at 4 n.1. While Bethea's counsel did not refer to Leahy as his law partner at the time of the *Batson* challenge, this fact could have been inferred from the title of counsel's law firm, "Boyce, Leahy & Francescon," which was listed on documents filed in the trial court. *See, e.g.*, R. at 14. Notably, Bethea's counsel never divulged the source of the information nor expressly told the trial court that Leahy had relayed this conversation to him directly, only that he had become "aware of a conversation." J.A. at 37.

[2] Bethea abandoned his *Batson* challenge to the prosecutor's peremptory strike against the other African-American juror.

peremptory strikes on African-American jurors, "[t]here are other African-Americans on the jury." *Id.* at 40.

The case proceeded to trial, with the Commonwealth presenting evidence of "Bethea's DNA" on the victim's "fingernails," the victim's blood stain on the floor mat of "Bethea's vehicle," and a pattern of "inconsistent statements" made by Bethea to an investigator. Appellant's Br. at 5. In his case-in-chief, Bethea only called his wife to the witness stand to support his alibi defense. The jury found Bethea guilty of first-degree murder and sentenced him to life imprisonment.

Nearly seven months after the trial, Bethea's counsel moved the court to set aside the verdict based upon his earlier *Batson* challenge. At a hearing on the motion, Bethea's counsel conceded that "[t]he Commonwealth gave a race-neutral reason, Your Honor." J.A. at 60. The problem, counsel argued, was that the prosecutor's recollection was mistaken about the question that she had asked and to which the juror had not responded: "The Commonwealth, at the time, said, 'And when I asked if everyone would promise to consider all the evidence and if they would raise their hand to do so, she didn't raise her hand.'" *Id.* "Now that question was not asked," Bethea's counsel asserted, "and that response was not called for." *Id.* at 60-61. Bethea's counsel acknowledged, however, that "during voir dire the Commonwealth did ask for a show of hands but it was to a different question regarding motive." *Id.* at 61. The question regarding motive asked jurors to raise their hand if "anyone here . . . has a problem with th[e] law" that does not require the Commonwealth to prove motive for murder. *Id.* The transcript reflected "[n]o response" to that question. *Id.* at 20.

Bethea's counsel affirmatively conceded that, at the time of his *Batson* motion, he had not objected to the Commonwealth's peremptory strike on the ground that the prosecutor's

4

recollection was mistaken. "We the defense did not object to this at the time . . . . [W]e didn't stand up and say well, Your Honor, that question was never asked." *Id.* at 66. As counsel viewed it, "if the defense had objected and said Your Honor, that question was never asked," counsel "suspect[ed] the Commonwealth's response would have been at that time yes, it was." *Id.* at 67.

Bethea's counsel argued that "there are only two possibilities" for why the transcript did not reflect the prosecutor's proffered race-neutral reason — either the prosecutor had made a mistake and "didn't remember properly what happened," or her proffered reason had "deliberately misrepresented the facts to the [c]ourt." *Id.* at 66-67. Bethea's counsel then emphatically stated: "I would like to state that in both the motion and in the argument today the defense was very careful in the words it used, went out of the way with great lengths with the way we phrased that, to avoid as much as possible implying any deliberate fraud." *Id.* at 73. "In the motion," Bethea's counsel told the trial court, "you will not see words like misrepresentation or false[hood] even though misrepresentation or a falsehood could be innocently made just as well as deliberately made. The defense didn't even want to come anywhere close to implying that." *Id.*

In response, the Commonwealth argued that ambiguities in the transcript made it difficult to respond to Bethea's argument because it "ignores . . . the non-verbal context in which these questions were asked." *Id.* at 70. The transcript, the Commonwealth further argued, did not refute the prosecutor's recollection that the juror had not specifically responded to all of the questions. In one of the questions from the prosecutor, she had asked the jurors for a show of hands if they had a "problem" with their duty to "follow the law" and not to require the Commonwealth to "prove something the law says we don't have to prove." *Id.* at 20. She

5

subsequently asked whether the jurors were "comfortable considering circumstantial evidence." *Id.* at 31. The Commonwealth, in response to Bethea's motion to set aside the verdict, explained what the transcript had not fully disclosed:

> What is lost in this latter portion of the transcript is the context in which the question was asked. The Commonwealth, having already asked members of the panel to raise their hands in response to a question, *raised her own hand in a demonstrative way and the jurors followed suit*. There was more than one occasion during the course of voir dire where the members raised their hand, despite only one instance being clear through the transcript. And *it was in response to just such a question when all the panel members, save for [the stricken juror], responded with raised hands*. The transcript does not and cannot reflect this fact.

*Id.* at 52-53 (emphases added).

The Commonwealth also placed great weight on the response that Bethea's counsel had given to the trial court at the time that the prosecutor had proffered a race-neutral reason for striking the juror. Counsel's response, the Commonwealth summarized, was not that the prosecutor "didn't ask her to raise her hand or she didn't raise her hand" to a particular question. *Id.* at 71. Counsel instead responded, "I don't think that amounts to anything," *id.* at 38, which the Commonwealth interpreted as an implied concession to the prosecutor's "assertion that the juror didn't raise her hand," *id.* at 71. After hearing these arguments, the trial court succinctly held that "the Commonwealth did give a race-neutral reason at that point. . . . [I]n the context of a trial and from all that was offered and argued at that time, I decided to deny the [*Batson* challenge to the] strike and I deny the motion in regard to that at this time as well." *Id.* at 76.

Bethea appealed to the Court of Appeals on two separate grounds, one of which addressed the *Batson* issue. The Court of Appeals observed that Bethea had "initially challenged the peremptory strike in the trial court based on a proffer of a hearsay statement purportedly made by the prosecutor to [defense counsel's law partner]." *Bethea v. Commonwealth*, 68 Va.

6

App. 487, 502 n.7 (2018). The Court of Appeals did not analyze the issue, however, because

Bethea had "provided no evidence supporting this hearsay allegation and [did] not rely on it on

appeal." *Id.* Instead, the Court of Appeals responded to Bethea's argument

> that the fact that the prosecutor did not actually ask the venire members to "raise their hands" if they "promised to consider all of the evidence," in direct contradiction of her representation to the trial court, plainly shows that the race-neutral reasons were pretextual. He suggests that the reason given concerning the question was pretextual and thus the other reasons given were by extension also pretextual. *However, the appellant's argument discounts the fact that a prosecutor may be both mistaken and genuine. An inaccuracy such as the one in this case is relevant to determining the prosecutor's credibility but does not as a matter of law compel the conclusion that the reason given is pretextual.*

*Id.* at 501-02 (emphasis added) (alterations and footnotes omitted). The Court of Appeals further

explained:

> The prosecutor's representation that she instructed the venire members to raise their hands if they promised to consider all the evidence was inaccurate. The record shows that she had in fact asked them to respond with a "yes" to the question of whether they would focus on the evidence presented to them and asked them to raise their hands in response to a different question. However, the represented question was sufficiently similar to the question asked and was race-neutral. In the context of these facts, the race-neutral reasons given were not pretextual as a matter-of-law.
>
> Additionally, the trial court's implicit determinations, both before and after the inaccuracy was discovered, that the prosecutor was credible in giving the race-neutral reasons was not clear error. No evidence in the record demonstrates that the trial court erred in deciding that the prosecutor did not purposefully discriminate based on race in striking the juror from the jury panel. The prosecutor represented that the venire member did not raise her hand when asked if she "promised to consider all of the evidence," but as was later discovered, the prosecutor actually asked similar questions that involved how the prospective jurors would view the evidence. The prosecutor also asked the prospective jurors to raise their hands if they had "a problem" applying legal rules limiting the amount of evidence that the Commonwealth was required to present.

7

*Id.* at 502-03 (alteration omitted).  The Court of Appeals affirmed Bethea's conviction, and this appeal followed.

II.

We granted this appeal on a single assignment of error:

> The Court of Appeals erred when it found that, in response to a timely *Batson* challenge, the Commonwealth's proffered race-neutral reason for striking a black juror was not pretextual as a matter of law, and thus affirmed Appellant's conviction. *Specifically*, the Court of Appeals erred when it affirmed the trial court's denial of Appellant's motion to set aside the verdict and declare a mistrial *because the Commonwealth's reason for the strike was the juror's failure to respond in a manner never requested to a question the Commonwealth never asked.*

Appellant's Br. at 2 (emphases added).

A.

We first address whether Bethea's assignment of error properly frames the issue on appeal.  At the time of the *Batson* challenge, Bethea's counsel stated that he was "watching" the juror throughout voir dire.  J.A. at 38.  Despite this attention, Bethea's counsel never suggested that the prosecutor was mistaken about the juror failing to raise her hand in response to the question that the prosecutor had recalled asking.  During argument on his motion to set aside the verdict, Bethea's counsel conceded this waiver:  "We the defense did not object to this at the time . . . .  [W]e didn't stand up and say well, Your Honor, that question was never asked."  *Id.* at 66.

That is a crucial concession.  If Bethea had made a specific and contemporaneous objection to the prosecutor's mistake, the trial court could have asked the court reporter to read back the real-time transcription to determine whether, if at all, the reporter had recorded the relevant non-verbal hand gestures and to clarify which, if any, of the questions linked up with the

8

prosecutor's recollection of the juror's failure to raise her hand. The trial court also could have called the juror out for additional voir dire questioning to determine whether she had understood the previous questions and had accurately communicated her responses. Any of these actions by the trial court — if it had known that they were necessary — could have completely defeated or, for that matter, conclusively proved, Bethea's *Batson* challenge. Moreover, if the prosecutor had been convinced during this process that her recollection was wrong, she might have simply withdrawn the peremptory strike altogether. None of these actions were considered or taken, however, because Bethea's counsel never contemporaneously objected to the prosecutor's peremptory strike on the ground that the prosecutor had mistakenly recollected voir dire.

In Virginia, objections to the seating of jurors must be asserted "[p]rior to the jury being sworn." Code § 8.01-352(A). Untimely objections are generally waived. A trial court has the authority to grant leave to make untimely objections, *see id.*, but only if the court's sound discretion warrants doing so. The statute also emphasizes that either a timely objection or an untimely objection permitted by leave of court is necessary for the court to grant a motion "setting aside a verdict or granting a new trial." Code § 8.01-352(B). Even then, however, the objecting party must prove that the "irregularity was intentional" or that it would "probably cause injustice" to one of the parties. *Id.*

Procedural-default principles require that the argument asserted on appeal be the same as the contemporaneous argument at trial. *See, e.g.*, *Riner v. Commonwealth*, 268 Va. 296, 325 (2004) (holding that an appellant waived a challenge to double-tiered hearsay by failing to specifically object to the trial court's incomplete ruling as to only one of the two tiers of

9

hearsay).[3] Specificity and timeliness undergird the contemporaneous-objection rule, animate its highly practical purpose, and allow the rule to resonate with simplicity: "Not just any objection will do. It must be both *specific* and *timely* — so that the trial judge would know the particular point being made in time to do something about it." *Dickerson v. Commonwealth*, 58 Va. App. 351, 356 (2011) (emphases in original) (citation omitted); *see also Palmer v. Atlantic Coast Pipeline, LLC*, 293 Va. 573, 579 (2017) (stating that the contemporaneous-objection rule requires "reasonable certainty at the time of the ruling" and "exists to protect the trial court from appeals based upon undisclosed grounds, to prevent the setting of traps on appeal, to enable the trial judge to rule intelligently, and to avoid unnecessary reversals and mistrials" (citations omitted)).

Consequently, neither an appellant nor an appellate court should "put a different twist on a question that is at odds with the question presented to the trial court." *Commonwealth v. Shifflett*, 257 Va. 34, 44 (1999). Specific, timely objections are required because they are often resolved, either because the trial court intervenes with a corrective ruling that accommodates the asserted interests of both sides or because opposing counsel gives a winning explanation that moots the objection altogether. *See Scialdone v. Commonwealth*, 279 Va. 422, 437 (2010) (explaining that a specific, contemporaneous objection "must be made *at a point in the proceeding* when the trial court is in a position, not only to consider the asserted error, but also to rectify the effect of the asserted error" and that "a specific, contemporaneous objection gives the

---

[3] *See also West Alexandria Props., Inc. v. First Va. Mortg. & Real Estate Inv. Tr.*, 221 Va. 134, 138 (1980) ("On appeal, though taking the same general position as in the trial court, an appellant may not rely on reasons which could have been but were not raised for the benefit of the lower court."); *Floyd v. Commonwealth*, 219 Va. 575, 584 (1978) (holding that this Court will not consider an argument that differs from the specific argument presented to the trial court, even if it relates to the same general issue).

opposing party the opportunity to meet the objection *at that stage of the proceeding*" (emphases

added) (alteration and citations omitted)).

Virginia's procedural-default principles apply to *Batson* challenges in the same way that

they apply to other trial objections. *See Buck v. Commonwealth*, 247 Va. 449, 452 (1994) ("At

trial, however, [the defendant] did not make the [*Batson*] arguments which he makes here.").[4]

To be sure, in the *Batson* context, federal courts applying their own contemporaneous-objection

rule have held that "a lawyer must challenge an adversary's use of peremptory challenges *before*

the completion of jury selection, in part so that the court can (i) contemporaneously assess the

adversary's conduct; and (ii) remedy any improper conduct without having to repeat the jury

selection process." *United States v. Franklyn*, 157 F.3d 90, 97 (2d Cir. 1998) (emphasis in

original). This rule has a highly practical application:

> Given the often subtle reasons for the exercise of peremptory
> challenges, a court's determination of whether a prosecutor has
> used them in a discriminatory fashion will often turn on the judge's
> observations of prospective jurors and the attorneys during voir
> dire and an assessment of their credibility. *It is nearly impossible*
> *for the judge to rule on such objections intelligently unless the*
> *challenged juror either is still before the court or was very recently*
> *observed.*

*Weeks v. New York*, 273 F.3d 76, 90 (2d Cir. 2001) (emphasis in original) (citation omitted),

*abrogated on other grounds by National R.R. Passenger v. Morgan*, 536 U.S. 101, 107-13

---

[4] *See also Ford v. Georgia*, 498 U.S. 411, 423 (1991) ("[A] state court may adopt a general rule that a *Batson* claim is untimely if it is raised for the first time on appeal, or after the jury is sworn, or before its members are selected."); *Batson*, 476 U.S. at 99 n.24 (making "no attempt to instruct [lower] courts how best to implement [the *Batson* ] holding"); *Lewis v. Commonwealth*, 25 Va. App. 745, 747 (1997) ("The United States Supreme Court has not specifically defined temporal parameters for the making of a *Batson* motion. Instead, the Court has left to the lower courts the decision to adopt timeliness rules.").

(2002). This reasoning closely parallels the views expressed by our Court of Appeals two decades ago:

> "The trial court is uniquely positioned to evaluate the circumstances in each case and to exercise its discretion" in deciding whether to reseat persons improperly struck from the jury panel or to discharge the venire and select a jury from a new panel. A trial court's exercise of discretion may be improperly cabined, however, if the challenge is made after the jury is sworn and the remaining venirepersons are discharged. At that point, the court cannot reseat a juror improperly stricken, and discharging the venire and beginning the process of jury selection anew may be compelled under the circumstances. Such a result will generally serve neither the public policy *Batson* seeks to advance, nor the fair administration of justice.

*Lewis v. Commonwealth*, 25 Va. App. 745, 751 (1997) (citation omitted).[5]

In this case, at the time of the *Batson* challenge, the prosecutor recalled a specific voir dire question ("if everyone would promise to consider all of the evidence") producing a specific response (a non-verbal "no") from a noticeably emotional juror. J.A. at 38. Bethea's counsel argued that this explanation was pretextual by claiming that "I don't think that amounts to anything, Your Honor. I mean, I was watching her. I didn't see her getting particularly emotional during the voir dire. I was scanning the jury for people to raise their hands. I don't know what that amounts to." *Id.*

---

[5] *See Ford*, 498 U.S. at 423 (stating that "[t]he requirement that any *Batson* claim be raised not only before trial, but in the period between the selection of the jurors and the administration of their oaths, is a sensible rule"); *see also United States v. Williams*, 819 F.3d 1026, 1029 (7th Cir. 2016); *United States v. Reid*, 764 F.3d 528, 533 (6th Cir. 2014); *United States v. Brown*, 634 F.3d 435, 440 (8th Cir. 2011); *Garraway v. Phillips*, 591 F.3d 72, 76 (2d Cir. 2010); *Morning v. Zapata Protein (USA), Inc.*, 128 F.3d 213, 216 (4th Cir. 1997); *McCrory v. Henderson*, 82 F.3d 1243, 1247 (2d Cir. 1996); *United States v. Parham*, 16 F.3d 844, 847 (8th Cir. 1994); *United States v. Maseratti*, 1 F.3d 330, 335 (5th Cir. 1993); *Dias v. Sky Chefs, Inc.*, 948 F.2d 532, 534 (9th Cir. 1991); *United States v. Romero-Reyna*, 867 F.2d 834, 837 (5th Cir. 1989); *Virgin Islands v. Forte*, 806 F.2d 73, 76 (3d Cir. 1986). *See generally* 6 Wayne R. LaFave et al., Criminal Procedure § 22.3(d), at 154 & n.227 (4th ed. 2015) (collecting cases).

Hearing just this response, it would not have been clear to the trial court that it should have sequestered this juror for further questioning. Accepting the prosecutor's recollection as true — a reasonable assumption absent a contest over its accuracy — there would be little reason for the trial court to seat a juror who would not "promise to consider all of the evidence," *id.* But the opposite would be true if Bethea's counsel had specifically asserted that the prosecutor's explanation was pretextual because she had *not* asked that question and because the juror had *not* responded to that unasked question with a non-verbal "no." If the trial court had heard this assertion, it is likely that the court would have engaged the *Batson* challenge differently.

Defending his admitted failure to contemporaneously assert that the prosecutor had a mistaken recollection of the voir dire, Bethea's counsel contends on appeal that his response to the prosecutor's proffered race-neutral reason was merely "ambiguous" and that his statements did not imply that he was "familiar with the question to which [the juror] failed to raise her hand." Reply Br. at 4-5 (quoting Appellee's Br. at 19-20). "This is mere speculation on the part of the Commonwealth," Bethea's counsel argues. *Id.* at 5. His "ambiguous statements," counsel maintains, did "not constitute [an] implicit acceptance that what the prosecutor said was true . . . . To be conclusive, it must be unambiguous." *Id.* at 7. Bethea's counsel implicitly concludes that we should consider the merits of his argument on appeal based upon not only his post-trial argument in support of his *Batson* motion but also his contemporaneous argument at trial.

We are unpersuaded by Bethea's attempt to combine his contemporaneous argument at trial with his post-trial argument. He argued at trial that the Commonwealth's race-neutral explanation was irrelevant, but then, seven months after trial, he argued for the first time that the prosecutor's explanation was highly relevant because it was based upon a mistaken recollection

13

of the voir dire exchange.  These arguments are quite different.  If that conclusion were the sum of the matter, we would not address his post-trial argument on appeal.

B.

During the post-trial hearing, the trial court did not state whether it was refusing to consider Bethea's newly asserted argument because it was untimely.  Nor did the court expressly grant Bethea leave under Code § 8.01-352(A) to make this argument.  Yet Bethea did make the belated argument, and without an express statement to the contrary, the trial court presumably considered this argument in its decision on the merits.  Given the uncertainty of the trial court's disposition on the timeliness of Bethea's specific *Batson* argument, we will assume without deciding that the trial court implicitly concluded that Bethea's post-trial argument merely amplified (rather than substantively changed) his contemporaneous argument at trial.  Even with that assumption, however, we find no error in the trial court's denial of Bethea's motion to set aside the verdict based upon his *Batson* challenge.

1.

The Founders understood the citizen jury as "the 'lower judicial bench' in a bicameral judiciary"[6] and "the democratic branch of the judiciary power."[7]  Protecting the integrity of this "sacred" tradition, Va. Const. art. I, § 11, *Batson* stands as a watchtower over voir dire in criminal cases to guard juries from being poisoned by racial bias whether injected by prosecutors or by criminal defense attorneys.  *Batson* does so by targeting "*purposeful* discrimination in

---

[6] Akhil Reed Amar & Les Adams, The Bill of Rights Primer 138 (2002) (quoting John Taylor, An Inquiry into the Principles and Policy of the Government of the United States 209 (W. Stark ed., 1950) (1814)).

[7] *Id.* (quoting Essays by a Farmer (IV), *reprinted in* 5 The Complete Anti-Federalist 36, 38 (Herbert J. Storing ed., 1981)).  *See generally* Akhil Reed Amar, The Bill of Rights: Creation and Reconstruction 11, 81-118 (1998).

selection of the petit jury." *Flowers v. Mississippi*, 139 S. Ct. 2228, 2241 (2019) (emphasis added).

A *Batson* challenge involves three sequential steps: (1) the opponent of the strike "must make out a prima face case" of purposeful discrimination; (2) "the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes"; and (3) "if a race-neutral explanation is tendered, the trial court must then decide whether the opponent of the strike has proved purposeful racial discrimination." *Johnson v. California*, 545 U.S. 162, 168 (2005) (alterations and citations omitted).

The three-step architecture of *Batson* presumes the good faith of prosecutors. "We have no reason to believe that prosecutors will not fulfill their duty to exercise their challenges only for legitimate purposes." *Batson*, 476 U.S. at 99 n.22. In sync with this first premise, "*Batson*, of course, explicitly stated that the defendant ultimately carries the 'burden of persuasion' to 'prove the existence of purposeful discrimination.'" *Johnson*, 545 U.S. at 170-71 (quoting *Batson*, 476 U.S. at 93).

"This burden of persuasion 'rests with, and never shifts from, the opponent of the strike.'" *Id.* at 171 (quoting *Purkett v. Elem*, 514 U.S. 765, 768 (1995) (per curiam)); *see also Rice v. Collins*, 546 U.S. 333, 338 (2006). "Thus, even if the State produces only a frivolous or utterly nonsensical justification for its strike, the case does not end — it merely proceeds to step three." *Johnson*, 545 U.S. at 171. Step three of a *Batson* challenge ends the analysis on the ultimate question — "whether the opponent of the strike has carried his burden of proving purposeful discrimination." *Id.*; *see Hernandez v. New York*, 500 U.S. 352, 363 (1991) (plurality opinion).

15

The burden of proof deserves emphasis, particularly given the contrary view advocated by our dissenting colleagues. The burden-shifting paradigm of a *Batson* challenge has been finely calibrated to define step one as a mere prima facie case of discrimination. If the trial judge is unpersuaded by the prosecutor's race-neutral explanation, which is required by step two, that does not mean that the trial judge has no choice but to hold that the allegation of discrimination in step one has been proved by a preponderance of the evidence. The reason why is because, under step one of *Batson*, a prima facie case need not "show that it is more likely than not" that the basis of the strike was purposeful racial discrimination. *Johnson*, 545 U.S. at 168. This is a "narrow but important" point. *Id.* The "'more likely than not' standard is an inappropriate yardstick" for a prima facie case under step one of a *Batson* challenge. *Id.* A fortiori, a mere "inference of discrimination" provided at step one, *id.* at 169-70, by itself, cannot set an immovable anchor for a later factual finding.

"The first two *Batson* steps," the Supreme Court has explained, "govern the production of evidence that allows the trial court to determine the persuasiveness of the defendant's constitutional claim." *Id.* at 171. "It is not until the *third* step that the persuasiveness of the justification becomes relevant — the step in which the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination*." Id.* (emphasis in original) (quoting *Purkett*, 514 U.S. at 768). In this way, the *Batson* framework "comports" with Title VII cases "holding that determinations at steps one and two of the [burden-of-production] framework 'can involve no credibility assessment' because 'the burden-of-production determination necessarily *precedes* the credibility-assessment stage,' and that the burden-shifting framework triggered by a defendant's prima fac[i]e case is essentially just 'a means of 'arranging the presentation of evidence.'" *Id.* at 171 n.7 (quoting *St. Mary's Honor*

16

*Ctr. v. Hicks*, 509 U.S. 502, 509-10 & n.3 (1993)) (citing *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978)).

The opposite view, adopted by the dissent, treats a prima facie case as irrefutable — so much so that no trial judge could resist its persuasive force without first finding whether the evidence of refutation overcomes it. The very definition of prima facie refutes this view. This Latin phrase simply means "[a]t first sight" or "on first appearance," not last sight or appearance. Black's Law Dictionary 1441 (11th ed. 2019) (defining "prima facie" further as "[s]ufficient to establish a fact or raise a presumption unless disproved or rebutted; based on what *seems to be true* on first examination, even though it may later be proved to be untrue" (emphasis added)).

Finding that evidence satisfies the prima facie standard only means that a reasonable factfinder could rationally accept the evidence ("[a]t first sight", *id.*) as satisfying the applicable burden of proof, and it does not mean the proponent of the prima facie case has in fact proven his case. *See Nance v. Commonwealth*, 203 Va. 428, 432 (1962) ("The [prima facie] presumption . . . cuts off no defense nor interposes any obstacle to a contest of the facts, and 'relieves neither the court nor the jury of the duty to determine all of the questions of fact from the weight of the whole evidence. "It is merely a rule of evidence and not the determination of a fact."'" (citation omitted)); *Barton v. Camden*, 147 Va. 263, 272-73 (1927) (acknowledging that a prima facie presumption "is not conclusive"); *cf. Gibson v. Commonwealth*, 287 Va. 311, 320 n.3 (2014) (stating that "[t]he burden of proof is not to be confused with the burden of going forward to produce evidence" and that the presentation of a prima facie case shifts only "the burden of producing evidence to overcome that prima facie case," not the burden of proof, which "never shifts"). For example, when a civil defendant in a bench trial loses a motion to strike at the end of the plaintiff's case, that does not mean that the trial judge has no choice but to enter a

verdict against the defendant if he offers no evidence of his own. It only means that the judge *could* find for the plaintiff but, before doing so, the judge must determine whether he — not some hypothesized reasonable factfinder — truly believed the plaintiff's evidence with the level of confidence required by the applicable burden of proof.

2.

In this case, Bethea's counsel conceded in the trial court that the prosecutor "gave a race-neutral reason," J.A. at 60, and thus, the *Batson* challenge could proceed to the third step. The prosecutor's reason was simple: She thought that she had seen an emotional juror who had failed to raise her hand to a specific voir dire question. For the *Batson* process to continue, the trial judge did not have to believe or disbelieve the factual accuracy of this assertion. Under *Batson*, the "'second step of this process does not demand an explanation that is persuasive, or even plausible'; so long as the reason is not inherently discriminatory, it suffices." *Rice*, 546 U.S. at 338 (quoting *Purkett*, 514 U.S. at 767-68).

Our colleagues in dissent, therefore, err by "combining *Batson*'s second and third steps into one, requiring that the justification tendered at the second step be not just neutral but also at least minimally persuasive, *i.e.*, a 'plausible' basis" because "[i]t is not until the *third* step that the persuasiveness of the justification becomes relevant — the step in which the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination." *Purkett*, 514 U.S. at 768 (emphasis in original) (citation omitted). "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Hernandez*, 500 U.S. at 360.

It is true that "implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." *Purkett*, 514 U.S. at 768. "But to say that a trial

18

judge *may choose to disbelieve* a silly or superstitious reason at step three is quite different from

saying that a trial judge *must terminate* the inquiry at step two when the race-neutral reason is

silly or superstitious." *Id.* (emphases in original). To allow the rejection of the prosecutor's

explanation in step two in order to render invincible the defendant's prima facie inference in step

one "violates the principle that the ultimate burden of persuasion regarding racial motivation

rests with, and never shifts from, the opponent of the strike." *Id.*[8]

3.

In this case, after conceding that the prosecutor had offered a facially race-neutral reason

for the strike, Bethea's counsel told the trial court at the post-trial hearing that the prosecutor's

---

[8] Openly taking a different view, the dissent begins with statement: "Once the Commonwealth's invalid reason for the strike is eliminated from consideration, all that remains is Bethea's assertion that the strike was racially motivated based on the prosecutor's previous 'Black Lives Matter' comment." *Post* at 28. This argument later becomes the sole basis of the dissent's conclusion:

> In light of the Commonwealth's failure to offer a plausible race-neutral explanation, all that remained for the trial court to consider in deciding the *Batson* challenge was Bethea's assertion that the strike of minority panel members was racially motivated which was supported by the unchallenged proffer. This state of facts leads me to the inevitable conclusion that Bethea's *Batson* challenge should have been granted.

*Post* at 37-38.

Embedded in this reasoning is the dissent's emphasis on the fact that the prosecutor "waived any argument regarding whether Bethea made a prima facie showing" of discrimination. *Post* at 29. I agree that she waived this argument. The only relevance of this waiver, however, is that the trial judge could not dismiss Bethea's assertion in step one as insufficient as a matter of law but instead had to proceed to step three. Then, and only then, could the trial judge consider the assertion on the merits to determine whether he believed it was more likely than not true. Moreover, even if the prosecutor had not waived any argument regarding Bethea's prima facie showing of discrimination, any such argument is moot. *See Hernandez*, 500 U.S. at 359 ("Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot.").

stated reason for the strike was not supported by the transcript and that "there are only two possibilities" for this conclusion — either the prosecutor had made a mistake and "didn't remember properly what happened," or her proffered reason had "deliberately misrepresented the facts to the [c]ourt." J.A. at 66-67. After the Commonwealth challenged the assertion that the prosecutor had misrepresented the facts, Bethea's counsel emphatically clarified his position: "I would like to state that in both the motion and in the argument today the defense was very careful in the words it used, went out of the way with great lengths with the way we phrased that, to avoid as much as possible implying any deliberate fraud." *Id.* at 73. "In the motion," Bethea's counsel told the trial court, "you will not see words like misrepresentation or false[hood] even though misrepresentation or a falsehood could be innocently made just as well as deliberately made. The defense didn't even want to come anywhere close to implying that." *Id.* By process of elimination, therefore, this concession left only one remaining possibility: The prosecutor simply had made a mistake.[9]

---

[9] Bethea has not asked to withdraw this concession, nor would we allow him to do so. A litigant cannot be permitted to "approbate and reprobate" by "disavow[ing] on appeal the very argument [he] made at trial" because "a litigant may not take 'successive positions in the course of litigation that are either inconsistent with each other or mutually contradictory.'" *Babcock & Wilcox Co. v. Areva NP, Inc.*, 292 Va. 165, 204 (2016) (citations omitted); *see also Wooten v. Bank of Am., N.A.*, 290 Va. 306, 310 & n.2 (2015) (describing the approbate-reprobate doctrine as "protect[ing] a basic tenet of fair play: No one should be permitted, in the language of the vernacular, to talk through both sides of his mouth").

The dissent seeks to relieve Bethea of his concession by dissecting counsel's statements to conclude that counsel conceded only that the prosecutor's race-neutral explanation was not a "fraud on the court." *Post* at 33-34. We think this interpretation is far too charitable. But, even so, fraud on the court is merely making a deliberate misrepresentation to a court. If the prosecutor did not deliberately misrepresent her reasons for the strike, as Bethea conceded, then the prosecutor truly believed her reasons, and thus, they were not pretextual. If she truly believed reasons that were factually inaccurate, then she simply made a mistake because she "didn't remember properly what happened." J.A. at 66.

20

In the *Batson* context, a "pretext" is a race-neutral explanation used to misrepresent and conceal the prosecutor's real motive — purposeful racial discrimination. Thus, a mere mistake, in and of itself, is not a pretext. *See Aleman v. Uribe*, 723 F.3d 976, 982 (9th Cir. 2013) ("After all, *Batson* prohibits purposeful discrimination, not honest, unintentional mistakes."). "What [*Batson*] means by a 'legitimate reason' is not a reason that makes sense, but a reason that does not deny equal protection." *Purkett*, 514 U.S. at 769. Put differently, *Batson* focuses not on the "*reasonableness* of the asserted nonracial motive" but "rather . . . the *genuineness* of the motive." *Id.* (emphases in original).

"It follows that *Batson* and its progeny direct trial judges to assess the *honesty* — not the accuracy — of a proffered race-neutral explanation." *Lamon v. Boatwright*, 467 F.3d 1097, 1101 (7th Cir. 2006) (emphasis in original).[10] A *Batson* challenge based upon the "factual accuracy" of the race-neutral explanation "aims at the wrong target." *Id.* The right target is the "credibility of the prosecutor's explanation" because that credibility determination "goes to the heart of the equal protection analysis." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) (quoting *Hernandez*, 500 U.S. at 367). "[O]nce that has been settled, there seems nothing left to review." *Id.* (quoting *Hernandez*, 500 U.S. at 367).

In short, Bethea's pretext argument collapses under its own weight. The logical flaw in Bethea's pretext argument is that the prosecutor's race-neutral reason cannot at the same time be

---

[10] *See also Lee v. Commissioner*, 726 F.3d 1172, 1226 (11th Cir. 2013) ("The conclusion that an honestly mistaken but race-neutral reason for striking a black venire member did not violate *Batson* was not unreasonable."); *United States v. George*, 363 F.3d 666, 674 (7th Cir. 2004) (explaining that, under *Batson*, "the government's proffered reason for the strike need not be particularly persuasive, or even based on quantifiable data, so long as it is not pretextual"); *United States v. Montgomery*, 210 F.3d 446, 453 (5th Cir. 2000) ("[T]he ultimate inquiry for the judge is not whether counsel's reason is suspect, or weak, or irrational, but whether counsel is telling the truth in his or her assertion that the challenge is not race-based.").

21

both an unintentional mistake and a pretextual, purposeful misrepresentation. Because Bethea conceded the former and disclaimed the latter in his post-trial argument, the *Batson* analysis in this case can and should stop there.

4.

On appeal, however, Bethea continues to press the pretext argument by circling back to the proffer that his counsel had made in support of his prima facie challenge to the prosecutor's peremptory strike. We have two responses. First, the Court of Appeals ruled that Bethea abandoned his argument that the hearsay remark proves the pretextual nature of the prosecutor's explanation. During oral argument before the Court of Appeals, Bethea was asked:

> But your point is not — because you do not have any notes and you never brought in any . . . evidence relating to the earlier statements to [counsel's law partner]. You didn't do that. *Your point was that it had to be a pretext because the statement, the question that the prosecutor said was asked was never asked, and that the juror was never asked to raise their hand. I mean, that was your whole argument*.

CAV Oral Argument Audio at 6:59 to 7:27, *Bethea*, 68 Va. App. 487 (Record No. 2014-16-4) (emphasis added). Bethea's counsel responded: "Yes, on the motion to vacate, that was essentially the argument. Yes, Your Honor." *Id.* at 7:28 to 7:33. As a result, the Court of Appeals held that Bethea had abandoned his argument that the pre-trial hearsay remark implied pretext. *See Bethea*, 68 Va. App. at 502 n.7 ("The appellant initially challenged the peremptory strike in the trial court based on a proffer of a hearsay statement purportedly made by the prosecutor to [counsel's law partner]. He provided no evidence supporting this hearsay allegation and does not rely on it on appeal.").

Bethea does not assign error to this holding on appeal to us or even challenge this holding in his briefs before this Court. Rule 5:17(c)(1)(iii) requires an assignment of error to "address

22

the findings, rulings, or failures to rule on issues in the trial court or other tribunal from which an appeal is taken." *See Parker v. Carilion Clinic*, 296 Va. 319, 332 (2018). When an appellant "fails to assign error to a particular holding," we treat it as "binding on appeal." *See Egan v. Butler*, 290 Va. 62, 79 (2015). Therefore, this pretext argument is not before us on appeal. *See Lawlor v. Commonwealth*, 285 Va. 187, 258 (2013) ("We consider only arguments within the scope of the assignment of error.").[11]

Second, Bethea cannot overcome the combined effect of the burden of proof and the appellate standard of review. From the beginning to the end of the *Batson* challenge, Bethea bore the burden of proving that the prosecutor's true motive was *purposeful* racial discrimination. The only suggestion of such a motive was counsel's initial proffer about an alleged remark made by the prosecutor to defense counsel's law partner, which, at a minimum, was double-tiered hearsay.[12] Bethea provided no additional evidence concerning this hearsay proffer, nor did he provide any context for the alleged statement.

---

[11] The dissent agrees that Bethea did not challenge the holding of the Court of Appeals on this point. *See post* at 35 n.7. The dissent nonetheless believes we should overlook Bethea's waiver because, when conducting a *Batson* analysis, courts should look at "all of the circumstances" in the record. *Post* at 35 n.7 (emphasis omitted) (quoting *Snyder v. Louisiana*, 552 U.S. 472, 478 (2008)). This argument confounds the appellate standard of review and the role of appellate procedural-default principles. *Snyder* held that a trial court reviewing a *Batson* objection should examine all facts before the court that either support or refute the objection, but that holding presupposes an objection was actually made in the trial court. Similarly, on appeal, we review the entire record in a host of circumstances (e.g., evidentiary sufficiency, *see Commonwealth v. White*, 293 Va. 411, 421 (2017), and suppression rulings, *see id.* at 414), but those tasks also presuppose that the appellant has preserved the issue on appeal.

[12] Because Bethea's counsel never divulged the source of this information and never expressly stated that his law partner had told him this information directly, *see supra* note 1, we have no way of knowing the exact number of hearsay tiers. The remark could have come to the attention of Bethea's counsel through a string of hearsay statements.

23

We must also view this hearsay remark from the trial court's perspective. The court

heard the remark only one time from Bethea's counsel. Counsel mentioned it at the very

beginning of his *Batson* challenge and never mentioned it again during his *Batson* argument at

trial. Over the course of 22 pages of transcript containing the parties' *Batson* arguments,

Bethea's counsel devoted only 6 lines of 1 page to the proffered remark. Given the remark's

ambiguity, its (at best) double-tiered hearsay nature, and counsel's tepid reliance upon the

remark, the trial court reasonably found that the remark did not prove that the prosecutor's

mistaken recollection amounted to *purposeful* racial discrimination.

The dissent relies upon the unchallenged-proffer rule to imply that the trial court should

have accepted the proffer as "in fact, true." *Post* at 30 n.2.[13] As we earlier observed, a trial court

advances to step two of the *Batson* analytical framework not based on any credibility findings

concerning the defendant's prima facie assertion in step one. *Supra* at 15-17. In this case, the

transition from step one to step two simply meant the trial court found that the hearsay proffer, *if*

*true*, could demonstrate purposeful discrimination.

Finally, the appellate standard of review bookends our discussion on this case.

Explaining its denial of Bethea's *Batson* motion, the trial court expressly held that the

prosecutor's explanations were "race-neutral reason[s] for making these particular peremptory

---

[13] Under settled principles, a "unilateral avowal of counsel of testimony that could be presented constitutes a proper proffer, if unchallenged." *Bloom v. Commonwealth,* 262 Va. 814, 821 (2001); *Whittaker v. Commonwealth,* 217 Va. 966, 969 (1977). Deeming this avowal a "proper proffer," however, merely renders admissible what would otherwise be an inadmissible hearsay statement by a lawyer. *Bloom*, 262 Va. at 821-22 (concluding that an "unchallenged pretrial proffer" allowed the proponent to forgo the requirement of proving "facts at trial to establish the *admissibility* of the statements"). The rule says nothing about the evidentiary weight the factfinder may or should give to the proffer. *See id.* at 821 (distinguishing that while a trial court determines the "factual questions underlying the admissibility of evidence," including whether "a proper proffer" has been presented, the factfinder "determines the weight of the evidence").

strikes, and I'm going to allow them to go forward as stricken." J.A. at 41. "*Batson*'s treatment

of intent to discriminate [i]s a pure issue of fact," *Hernandez*, 500 U.S. at 364, and "a trial court

finding regarding the credibility of an attorney's explanation of the ground for a peremptory

challenge is 'entitled to "great deference,"'" *Davis v. Ayala*, 135 S. Ct. 2187, 2199 (2015)

(citation omitted). This deference is understandable because the judicial "evaluation of the

prosecutor's state of mind based on demeanor and credibility lies 'peculiarly within a trial

judge's province.'" *Hernandez*, 500 U.S. at 365 (quoting *Wainwright v. Witt*, 469 U.S. 412, 428

(1985)). "[I]n the absence of exceptional circumstances," therefore, appellate courts should

"defer to the trial court" because "[a]ppellate judges cannot on the basis of a cold record easily

second-guess a trial judge's decision about likely motivation." *Davis*, 135 S. Ct. at 2201. As no

such exceptional circumstances exist in this case, we decline Bethea's "invitation to erode the

proof burden of the defendant established in *Batson*." *Buck*, 247 Va. at 453.

5.

To be clear, we are not suggesting that a prosecutor's mistaken explanations may never

be challenged as pretextual. No doubt they can be. A recent example of a *faux* mistake that was

held to be pretextual appears in *Flowers*, in which the United States Supreme Court recognized:

> To be sure, the back and forth of a *Batson* hearing can be hurried,
> and prosecutors can make mistakes when providing explanations.
> *That is entirely understandable, and mistaken explanations should
> not be confused with racial discrimination.* But when considered
> with other evidence of discrimination, a series of factually
> inaccurate explanations for striking black prospective jurors can be
> telling. So it is here.

139 S. Ct. at 2250 (emphasis added).

*Flowers* held that the proffered explanation in that case was not a mistake at all, but

rather a pretextual excuse camouflaging the prosecutor's purposeful racial discrimination. *See*

*id.* Those facts included the same prosecutor subjecting the defendant to 6 successive trials for the same murders, during which the prosecutor struck a combined 41 of 42 African-American jurors. *See id.* at 2234-36. During the sixth trial, the prosecutor struck five of six African-American jurors, discriminated between African-American and white jurors in the vigor and the extent of voir dire questioning, and, tellingly, offered a supposed "misstatement" as to the reason for striking one of the jurors, which provided yet "another clue showing discriminatory intent." *Id.* at 2250-51. Suffice it to say, Bethea's case does not come close to the facts in *Flowers*.[14]

### III.

Assuming arguendo that Bethea's assignment of error properly framed the issue on appeal, we hold that the trial court did not err in denying his motion to set aside the verdict based upon his *Batson* challenge. The record provides ample support for the trial court's finding that Bethea had not shouldered his burden of proving purposeful racial discrimination. Given the "great deference" owed to the trial court's factual findings, *Batson*, 476 U.S. at 98 n.21, we affirm the judgment of the Court of Appeals.

*Affirmed*.

JUSTICE POWELL, with whom JUSTICE MIMS joins, dissenting.

---

[14] Nor does Bethea's case have any similarities with *Foster v. Chatman*, a habeas case in which the "contents of the prosecution's file . . . plainly belie[d] the State's claim that it exercised its strikes in a 'color-blind' manner." 578 U.S. ___, ___, 136 S. Ct. 1737, 1755 (2016). "The sheer number of references to race in that file [was] arresting." *Id.* The file included the letter "N" next to the names of each of the African-American jurors, "definite NO's" noted next to several African-American jurors, and an emphatic "*NO. NO Black Church.*" *Id.* at 1744 (emphases in original). The evidence plainly showed that the prosecutor's purported race-neutral reasons for the challenged peremptory strikes were "misrepresentations to the trial court," *id.* at 1749, intended to hide his true discriminatory motivation. *See id.* at 1754-55.

A horrific crime was perpetrated against a white male. The defendant, Bethea, is African American. Bethea's first trial ended in a mistrial, with three jurors voting to acquit him. During juror selection for the retrial, the Commonwealth used two of its peremptory strikes to remove two African American jurors. Counsel for Bethea then made a *Batson* challenge, stating:

> I'm aware of a conversation between [the prosecutor] and . . . Mr. Leahy where Mr. Leahy was told that the last time, the jury was nine-to-three to convict, and the three people who voted to acquit were black and then something about the Black Lives movement.

The trial court immediately requested that the Commonwealth provide a race-neutral reason for the strikes. In response, the Commonwealth stated that the reason it struck one of the jurors was because "[s]he didn't answer all the questions and she appeared emotional at times." Specifically, the prosecutor explained "when I asked if everyone would promise to consider all of the evidence, and if they would raise their hand to do so, she didn't raise her hand." The prosecutor further insisted "I asked, will everyone promise to consider all of the evidence in this case, circumstantial and otherwise, and everyone on the panel raised their hand except for her." In response, the trial court asked "[a]re you saying that she indicated that she would not listen to all the evidence?" The prosecutor responded "[b]y not raising her hand when everyone else did."

The trial court then stated:

> I do recall when you made the request, when the jury was to raise the hand. I did not scan the jury, but I did not see at that time that anybody did not raise their hand. Did she nod and not raise her hand?

To which the prosecutor again responded "[s]he didn't raise her hand."

A review of the record indicates that the question identified by the prosecutor was never asked. The record further reveals that the Commonwealth explicitly asked for a show of hands to a single question:

Is everyone here willing to follow the law and absolutely make us prove the things that we have to prove to you, but not make us prove the things that the law says we don't have to prove? *Raise your hand if you have a problem with that law*; you won't make us prove something the law says we don't have to prove?

(Emphasis added.) There was no response from the jury panel.

In response to Bethea's post-trial motion, the Commonwealth acknowledged that the question was not asked. However, it asserted that the actual question that was not answered was "Are you comfortable considering circumstantial evidence in terms of a criminal case?" The Commonwealth concluded its argument by stating "[w]hether it was refusing to agree to 1) follow the law; or 2) to consider all the evidence, the Commonwealth clearly proffered a race-neutral and appropriate reason to exercise a preemptory strike." Noticeably absent from the Commonwealth's post-trial explanation for the peremptory strike was the fact that the record unequivocally demonstrates that the jury panel verbally responded "Yes" to the circumstantial evidence question. Further, at no time did the Commonwealth ever claim that it may have been mistaken as to what was asked or what answers were given by the juror.

The United States Supreme Court has recognized that peremptory strikes "are often subjects of instinct . . . and it can sometimes be hard to say what the reason is." *Miller-El v. Dretke*, 545 U.S. 231, 252 (2005). However, when a *Batson* challenge is raised, "a prosecutor simply has got to state his reasons as best he can and stand or fall on the plausibility of the reasons he gives." *Id.*

The majority's decision in the present case would allow a prosecutor's demonstrably false reason to stand, notwithstanding the fact that, after all three steps of the *Batson* analysis have been conducted, such a reason is necessarily implausible. Once the Commonwealth's invalid reason for the strike is eliminated from consideration, all that remains is Bethea's assertion that the strike was racially motivated based on the prosecutor's previous "Black Lives

28

Matter" comment. As "excluding a potential juror solely on the basis of the juror's race is purposeful discrimination and a violation of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution," *Jackson v. Commonwealth*, 266 Va. 423, 435 (2003) (citing *Batson v. Kentucky*, 476 U.S. 79, 89 (1986)), I must respectfully dissent.

Adjudicating a *Batson* challenge involves a three-step process.

> First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination.

*Hernandez v. New York*, 500 U.S. 352, 358–59 (1991) (citations omitted).

With regard to the first step, the Commonwealth has waived any argument regarding whether Bethea made a prima facie showing that the Commonwealth made its peremptory strikes on the basis of race by immediately offering purportedly race-neutral explanations for the strikes. *See id.* at 359 ("Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot."); *Faison v. Hudson*, 243 Va. 397, 402 (1992) (recognizing that offering a race-neutral explanation for a strike without raising the procedural issue of whether a prima facie case of discrimination was established waives any subsequent challenge on the issue).

Notwithstanding the Commonwealth's waiver of any challenge to the truth of this assertion, the majority discounts the proffered racial remarks made by the prosecutor. Notably, the majority characterizes the allegation as an ambiguous, double-tiered hearsay statement

29

unsupported by any evidence.[1]  This Court has recognized, however, that "a unilateral avowal of counsel, if unchallenged, or a mutual stipulation of the testimony expected constitutes a proper proffer."  *Whittaker v. Commonwealth*, 217 Va. 966, 969 (1977).  Here, the Commonwealth did not object or challenge the proffer in the trial court and the prosecutor who allegedly made the comments never disputed[2] them.  In the absence of any challenge by the Commonwealth, the proffered remarks constituted a proper proffer that could be relied upon.

Having accepted the unchallenged proffer, the trial court proceeded to the second step of the *Batson* analysis and required that the Commonwealth provide a race-neutral reason for striking the juror.  The Commonwealth offered two explanations for striking the juror at issue here: she appeared emotional[3] and she did not answer all of the Commonwealth's questions.[4] The Commonwealth specifically took issue with the juror's alleged failure to answer whether she would consider all the evidence.  "At this step of the inquiry, the issue is the *facial* validity of the

---

[1] The majority also notes "counsel's tepid reliance upon the remark," referring to the fact that the remark was only briefly discussed during the *Batson* challenge.  However, as I explain, there was no need to continue to discuss the proffer at that time.  Further, contrary to the majority's assertion, Bethea also relied on the remark in his motion to set aside the verdict, his brief to the Court of Appeals and, albeit briefly, in oral argument before the Court of Appeals.

[2] To me, it is the prosecutor's silence on this matter that is most telling.  Given the nature of these remarks, I can think of no reason that any attorney, much less an assistant Commonwealth's Attorney, would remain silent in the face of such accusations, unless they were, in fact, true.

[3] Whether the juror actually appeared emotional was disputed by Bethea's counsel and there is no indication that the trial court based its ruling on this issue.  In the absence of a specific finding on whether the juror was emotional, the Court cannot presume that the trial court credited the Commonwealth's assertion on this issue.  *See Snyder v. Louisiana*, 552 U.S. 472, 479 (2008).

[4] The Court of Appeals stated that the Commonwealth offered three reasons, however, a review of the record demonstrates that two of the reasons identified by the Court of Appeals were actually the same reason with differing degrees of specificity.  Indeed, the only question that the Commonwealth asserts that the juror did not answer was whether she would consider all the evidence.

30

prosecutor's explanation." *Hernandez*, 500 U.S. at 360 (emphasis added). Here, there is no dispute that the offered explanations by the Commonwealth were facially race neutral.

The third step in adjudicating a *Batson* challenge requires the trial court to determine whether the defendant carried his burden in light of the submissions by the parties. This step no longer looks to the facial validity of the offered race-neutral explanation; rather, "the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge *should be believed*." *Id.* at 365 (emphasis added). Stated another way, the credibility of the explanation offered by the Commonwealth is at issue. *See id.* at 367 ("The credibility of the prosecutor's explanation goes to the heart of the equal protection analysis."). It is here that the trial court erred.

The record unequivocally demonstrates that the events that formed the main thrust of the Commonwealth's race-neutral explanation never happened. The transcript of the *voir dire* reveals that the Commonwealth's explanation had no factual basis because 1) it only asked one question where the members of the venire were specifically told to raise their hands and none of the jurors raised their hands in response[5] and 2) it never asked the question that it claimed that the juror did not answer. Thus, the Commonwealth's race-neutral explanation was simply not true and, once the trial court became aware of this fact, that explanation necessarily lacked any credibility.

---

[5] The Commonwealth's claim that the transcript does not properly convey the context of its questions because it does not show that the prosecutor conducting the *voir dire* had "raised her own hand in a demonstrative way and the jurors followed suit" is particularly unavailing. Notably, the Commonwealth cannot point to which particular question the juror failed to respond to, which is odd given that it has access to the transcript and all of the questions asked as *voir dire*. What is clear, however, is that, because the Commonwealth cannot pinpoint the question at issue, it cannot successfully argue the nature of the jurors' response (i.e., whether it was verbal or by raising hands).

31

Moreover, a "stated reason that does not hold up" has "pretextual significance" that "does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false." *Miller-El*, 545 U.S. at 252. *See also Purkett v. Elem*, 514 U.S. 765, 768 (1995) (per curiam) ("At [the third] stage, implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination."). Thus, once it was established that the Commonwealth's stated race-neutral explanation had no basis in fact, it became pretextually significant, especially in light of the fact that Bethea had already made a prima facie showing that the Commonwealth's strike was racially motivated.[6]

The majority, however, takes the position that, at most, the Commonwealth simply made a mistake and a mistake cannot be a pretext. Although I agree with the majority that an honest, unintentional mistake cannot be a pretext, I cannot agree with the majority's determination that the record supports its supposition that such a mistake exists in the present case. Notably, there is nothing to indicate that the prosecutor's actions amounted to an honest, unintentional mistake. Neither the majority nor the Commonwealth can point to any evidence in the record establishing that the prosecutor simply misspoke or referenced the incorrect question. Indeed, a review of the transcript demonstrates that there was no question asked where a juror's failure to raise his or her hand would have justified striking that juror. Rather, all of the disqualifying questions clearly

---

[6] The majority asserts that, because at one point during his argument counsel for Bethea stated that "[t]he Commonwealth gave a race-neutral reason," he conceded that the Commonwealth's offered reason was not a pretext. The context in which this statement was made, however, clearly indicates that Bethea's counsel was not making such a concession. At most, this statement merely acknowledged that the Commonwealth had met its burden in the second step of the *Batson* challenge: it offered a facially race neutral explanation for the strike. Notably, counsel followed this statement up by insisting that the Commonwealth's facially race-neutral reason was a pretext because it was not "a race-neutral reason *that was true*." (Emphasis added.)

32

received a verbal response (e.g., "Are you comfortable considering circumstantial evidence in terms of a criminal case?" Jury response: "Yes.").

Moreover, the Commonwealth never asserted that it made a mistake. At most, when shown that its assertion was false, the Commonwealth merely posited that perhaps it was a different question or a similar question, without pointing to a specific question with a disqualifying response.

Rather than address the fact that the Commonwealth offered a demonstrably false reason to justify the strike, the majority instead relies on a "concession" from Bethea's counsel that "[t]he prosecutor simply had made a mistake." *Ante* at 16-17. By relying on this purported "concession," the majority never addresses the fact that the Commonwealth failed to offer a legitimate race-neutral explanation for the strike. Moreover, I disagree with the majority's interpretation of the record to find this "concession."

The language quoted by the majority to establish the "concession" was taken from counsel's arguments on two separate issues and combined to establish the alleged "concession." The first part of the "concession" was derived from counsel's explanation to the trial court for why he did not immediately object to the prosecutor's initial explanation. While discussing why he "didn't stand up and say . . . Your Honor, that question was never asked," counsel explained:

> Your Honor, there are only two possibilities. The first is that misrepresentation was not delivered, in which case the Commonwealth's argument appears to be, well, we didn't remember properly what happened but the defense had the obligation to remember, and the Court had the obligation to remember.

> . . . .

> Your Honor, as lawyers we must rely on what the [opposing] counsel says to the tribunal to be true.

> . . . .

The second possibility, is that it was deliberate, and then the argument would be we deliberately misrepresented the facts to the Court. We deliberately worked a fraud on the Court. But because the defense did not catch it at the time it was committed. That of course can not stand.

The Commonwealth responded by taking the position that counsel's argument implied that the prosecutor committed fraud on the court and was "unfair to the Commonwealth and [the prosecutor]." It is from counsel's response to this argument that the majority takes the second part of its "concession." Specifically, in response to the Commonwealth's assertion that he was making an "unfair" argument, counsel for Bethea stated:

I would like to state that in both the motion and in the argument today the defense was very careful in the words it used, went out of the way with great lengths with the way we phrased that, to avoid as much as possible implying any deliberate fraud.

In the motion you will not see words like misrepresentation or false even though misrepresentation or a falsehood could be innocently made just as well as deliberately made. The defense didn't even want to come anywhere close to implying that.

In my opinion, when the entire record is considered, it is clear that counsel for Bethea did not concede a mistake was made. Notably, counsel described the Commonwealth's response to the post-trial motion by stating: "Quite frankly, Your Honor, it is after the fact rationalization." While some of counsel's statements could be read to indicate the possibility that the prosecutor had made a mistake, the summation of his argument belies any claims that he conceded a mistake was made. Specifically, counsel stated: "I would submit to the Court that the Commonwealth's response shifting the reason supports the defense argument, that the initial reason was pretextual." The totality of counsel's arguments undermines the majority's conclusion that a concession was made, given that his entire argument was that the prosecutor intentionally removed the juror on account of race.

Furthermore, the notion that such a concession would be made by counsel for Bethea is rather curious in light of the fact that neither the Commonwealth nor the prosecutor ever claimed a mistake was made. Rather, the prosecutor repeatedly insisted that the juror failed to raise her hand in response to the question that was never asked and the Commonwealth has consistently taken the position that the proffered question or a similar one was asked. Tellingly, the record does not support either assertion.

The fact that the Commonwealth has offered multiple explanations for the strike, none of which is based in fact, is by far the most telling aspect of this case. At trial, the prosecutor stated that the juror failed to raise her hand in response to the non-existent question; a claim that the prosecutor repeated at least four times, even when the trial court indicated that it "did not see at that time that anybody did not raise their hand." As has been repeatedly explained, no such question was asked and, therefore, the prosecutor's emphatic assertion that the juror failed to respond was demonstrably false. Then, in response to the motion to set aside the verdict, the Commonwealth insisted that the question that the juror did not respond to was "Are you comfortable considering circumstantial evidence in terms of a criminal case?" Again, a simple review of the transcript reveals that this was also incorrect. Notably, the record demonstrates that the entire jury panel answered "Yes," which clearly undermines the Commonwealth's newly offered rationale.

When these different explanations are viewed in conjunction with the initial proffer,[7] it leads to the inevitable conclusion that this was not an honest, unintentional mistake. *See Flowers*

---

[7] The majority insists that Bethea has abandoned any reliance on the proffered statement made by the prosecutor and, therefore, the proffered statement cannot be considered in determining whether the Commonwealth's false explanation was pretextual. It is true that Bethea did not challenge the Court of Appeals' ruling that "[h]e provided no evidence supporting

*v. Mississippi*, 139 S. Ct. 2228, 2250 (2019) ("[W]hen considered with other evidence of discrimination, a series of factually inaccurate explanations for striking black prospective jurors can be telling.")[8] Rather, it appears that, having experienced a hung jury in the previous trial, where all three jurors who voted to acquit were African American, the prosecutor was attempting to avoid the possibility of another hung jury. As the Commonwealth failed to offer a valid race-neutral explanation for striking the juror at issue here, the only remaining explanation is the one supplied by Bethea's counsel.

Finally, the majority's reliance on the "great deference" that is afforded the trial court's finding with regard to the prosecutor's credibility is misplaced. *Ante* at 26. Pointing to the trial court's initial ruling that the prosecutor gave a "race-neutral reason for making these particular peremptory strikes," the majority concludes that no "exceptional circumstances exist in this case" that would permit the Court to disturb this finding. However, one such exceptional

---

this hearsay allegation and does not rely on it on appeal." *Bethea v. Commonwealth*, 68 Va. App. 487, 502 n.7 (2018). His failure to challenge that ruling, however, does not change the fact that the proffer must still be considered as part of the overall *Batson* analysis. As the United States Supreme Court has explained, "in considering a *Batson* objection, or in reviewing a ruling claimed to be *Batson* error, *all of the circumstances that bear upon the issue of racial animosity must be consulted.*" *Snyder*, 552 U.S. at 478 (emphasis added). Notably, the consideration of all circumstances bearing upon the issue of racial animosity is not limited to the court conducting the initial *Batson* analysis; the United States Supreme Court expressly required similar consideration by appellate courts reviewing a lower court's analysis. *See id.* The fact that no objection was raised to the Court of Appeals' ruling on the proffered statement does not eliminate the statement as a circumstance bearing upon the issue of racial animosity. Thus, the proffered statement, which was implicitly accepted as true by the trial court and never disputed by the Commonwealth or the prosecutor, is a necessary factor that must be considered in determining whether the Commonwealth's implausible explanations were pretextual.

[8] According to the majority, "[a] *Batson* challenge based upon the 'factual accuracy' of the race-neutral explanation 'aims at the wrong target.'" *Ante* at 17 (quoting *Lamon v. Boatwright*, 467 F.3d 1097, 1101 (7th Cir. 2006)). Given the United States Supreme Court's recent recognition that "*factually inaccurate explanations* for striking black prospective jurors can be telling," *Flowers* 139 S. Ct. at 2250 (emphasis added), I find the majority's reliance on *Lamon* to be misplaced.

36

circumstance that has been recognized is where the factual findings of the lower court are "clearly erroneous." *Foster v. Chatman*, 578 U.S. ___, ___, 136 S. Ct. 1737, 1747 (2016) (citing *Snyder*, 552 U.S. at 477). Here, the basis for the trial court's initial ruling was subsequently proven unequivocally false and, therefore, the ruling was clearly erroneous. In light of this obvious "exceptional circumstance," the appellate standard of review does not require this Court to give any deference to the trial court's ruling.

In summation, it is clear to me that the three-step *Batson* analysis weighs heavily in Bethea's favor. Bethea's assertion that the strike was racially motivated was supported by counsel's unchallenged proffer of the prosecutor's racially charged comments regarding Bethea's prior trial. When considered against the backdrop of the prior hung jury and the strike of minority panel members, the Commonwealth's lack of any attempt to rebut, disprove or even challenge the proffered statement of the prosecutor sufficiently establishes the proffer as a fact. Thus, Bethea met his burden of making a prima facie showing under the first step of the *Batson* analysis. The Commonwealth, in turn, offered several facially race-neutral explanations for the strike, thereby meeting its burden under the second step of the *Batson* analysis. At the same time, however, the Commonwealth never claimed that the strikes were based on a mistake. The third step of the *Batson* analysis turns on the plausibility of the Commonwealth's explanations, all of which proved to be invalid in the present case and were, therefore, implausible. In light of the Commonwealth's failure to offer a plausible race-neutral explanation, all that remained for the trial court to consider in deciding the *Batson* challenge was Bethea's assertion that the strike of minority panel members was racially motivated, which was supported by the unchallenged proffer. This state of facts leads me to the inevitable conclusion that Bethea's *Batson* challenge

should have been granted.  Accordingly, I would reverse the decisions of the Court of Appeals and the trial court and remand the matter for a new trial.